# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs March 14, 2006

## STATE OF TENNESSEE v. LATONYA TAYLOR

### Direct Appeal from the Circuit Court for Rutherford County
### No. 51621A      Don R. Ash, Judge

---

### No. M2005-00272-CCA-R3-CD - Filed August 25, 2006

---

The defendant, Latonya Taylor, was convicted by a jury of three counts of premeditated first degree murder and three counts of felony first degree murder. The latter three counts were merged with the premeditated first degree murders. The defendant was also convicted of especially aggravated robbery (Class A felony) and two counts of especially aggravated kidnapping (Class A felony). An effective sentence of life without parole plus twenty years was imposed. She appeals the convictions. From our review of the record we conclude that the evidence was sufficient to support the verdicts, and there being no other reversible errors, the judgments of conviction are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which DAVID G. HAYES and ROBERT W. WEDEMEYER, JJ., joined.

Hershell Koger, Pulaski, Tennessee, and Paul J. Bruno, Nashville, Tennessee, for the appellant, Latonya Taylor.

Paul G. Summers, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General; and Thomas F. Jackson and J. Paul Newman, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case concerns the murder of three employees of the Captain D's restaurant in Smyrna in connection with an aggravated robbery and aggravated kidnappings. These incidents occurred on July 11 or 12 of 2000. After a lengthy investigation, the defendant and her cousin, Percy Palmer, were charged with the offenses. The co-defendants' trials were severed, and this appeal deals only with the defendant, Latonya Taylor. Based on the evidence adduced at trial, the defendant was convicted of three counts of premeditated first degree murder, especially aggravated robbery, and two counts of especially aggravated kidnapping. Our review of the evidence is not to re-weigh or

re-evaluate the evidence. State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003). The State's theory having prevailed is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn therefrom. State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000); see also State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

Melanie Taylor, a cousin of the defendant, testified that the defendant requested her to come to the Driftwood Motel in Lavergne. There the defendant introduced Ms. Taylor to Percy Palmer and discussed a plan to rob an unnamed place where the defendant claimed she had an inside contact. The defendant stated that she and Percy Palmer would be involved and that she had a gun. When Ms. Taylor declined to participate in the scheme, the defendant requested to use her car. Ms. Taylor stated that the conversation occurred during the week of July 13, 2000. She remembered that July 13 was the defendant's birthday and that the defendant invited her to a gathering to celebrate the occasion.

Wes Mitchell, the General Manager of Captain D's in Smyrna, testified that he left the restaurant at 2:30 p.m. on July 11, 2000. Employees who remained included: Brian Speight, Assistant Manager; Scott Myers, Manager Trainee; and Troy Snell and Doug Wagner, cashiers. Mr. Mitchell explained the physical location and layout of the restaurant. It is located at 402 N. Lowry Street, flanked on the south side by a BP convenience store and service station and on the north by a Shoney's Restaurant. The Captain D's restaurant was equipped with an alarm system with panic buttons at the cash registers and the manager's desk. No surveillance cameras were present. Of the employees working, only Brian Speight had keys to the restaurant. His keys were never recovered. Mr. Mitchell stated that closing time that evening was 10:00 p.m. His inspection of the premises after the robbery indicated that the employees were about twenty minutes from finishing the cleanup. He observed no signs of a struggle within the restaurant. Approximately $1600 was taken in the robbery. A deposit bag and petty cash were still in the lower compartment of the safe. Time records on the computer indicated that Doug Wagner clocked out at 11:51 p.m. on July 11, and Troy Snell clocked out at 12:06 a.m. on July 12. Brian Speight did not clock out. Scott Myers had clocked out at 8:09 p.m. on July 11, but had obviously returned.

On cross-examination, Mr. Mitchell stated that ordinarily the closing procedures could be completed in one hour. He stated that the back door was locked magnetically at 5:00 p.m. and was then on alarm mode. The alarm, if sounded, would be audible at adjacent buildings. No driving entrances or exits from Captain D's existed except from North Lowry Street.

A cashier at Captain D's, Doug Wagner, checked out at 11:51 p.m. on July 11. He stated that Scott Myers had returned to the restaurant at 11:00 p.m. to learn the close-out audit procedure.

Lori Ann Wagner, Doug's mother, testified concerning picking up Doug on the evening of July 11. When she first arrived, she saw a male walking by the Captain D's building. She did not see the man's face but described him as medium build, dark or brown-skinned, with dark hair, and dressed in jeans with a "Levi looking" shirt thrown over his shoulders. The man continued walking

toward the mall. She saw Troy Snell and Brian Speight walking Doug to the door as he left. Ms. Wagner had never seen the defendant before trial.

Jamie Johns testified that she worked at Shoney's, adjacent to Captain D's on the night of July 11. She had known the defendant and Percy Palmer from their past work experiences at Shoney's. She stated that the defendant and Palmer came to Shoney's just before closing at 11:00 p.m. The defendant asked to borrow $50.00 from her, and Ms. Johns refused.

Gina Williams, the Assistant Manager at Shoney's, was the last employee to leave the restaurant on July 11. She testified that while leaving, she saw a black male and a black female in Captain D's. She described the female as "thick" and as wearing her hair up. The woman had a backpack or bag and was placing it on her shoulders. Ms. Williams did not see the black female's face and did not know the defendant or Percy Palmer. She stated that she set the alarm at Shoney's as she left at 12:01 a.m. on July 12. She recalled seeing five cars parked in Captain D's parking lot.

A stipulation was entered into the record from Shoney's security provider that the alarm at the Smyrna Shoney's was set at 12:01 a.m. on July 12.

Steven Heckler and his wife, Shannon, lived at Imperial Garden Apartments near the defendant's sister, Tiffany Taylor. Mr. Heckler testified that he and his wife socialized with Tiffany and the defendant. He stated that he also knew Percy Palmer. Mr. Heckler saw the defendant and Palmer walking away from the apartments at approximately 10:45 or 11:00 p.m. on July 11. He stated that he saw them returning to the apartments about two hours later. Palmer was carrying a sack, and the defendant carried the blue duffel bag that she had when they departed. He described the duffel bag as having straps that could be used for a shoulder carry. He said the defendant ordinarily carried a change of clothes and a .380 caliber pistol in the bag. On cross-examination, Mr. Heckler said that the defendant and Palmer stated they were going to go to the BP station for beer. The two were walking at a normal pace on their return.

John Pierce was a truck driver whose job was to empty the dumpsters on his designated route in Smyrna. His route included Captain D's and K-Mart. He stated that he emptied the dumpsters at Captain D's at approximately 2:00 a.m. on July 12. He noticed two cars parked there and noted there were usually none. Later, while at the dumpsters behind K-Mart, he saw a car with the lights on very dim. A boy was sitting in the car, apparently asleep, with the seat reclined. Mr. Pierce attempted to wake the individual with unnecessary noise but noticed no reaction. Mr. Pierce then left and notified his dispatcher to have the Smyrna Police investigate.

Wanda Jackson was the dispatcher whom Mr. Pierce notified concerning the car and its occupant behind K-Mart. She testified that she relayed the information to the Smyrna Police.

Salom Alhasmawy was employed as a night clerk at the BP station adjacent to Captain D's. He identified the defendant as having been a regular customer at the BP station. Mr. Alhasmawy stated there were four video surveillance cameras at the BP: one behind the first register, one facing

the cigarette cabinet, one facing the front door, and one outside the building. The videotapes displayed the date and the time of filming. The videotapes showed the defendant and Palmer in the BP at 10:43 p.m. on July 11. The defendant was wearing blue shorts and a blue shirt. Mr. Alhasmawy said that the Captain D's was not visible from inside the BP station. He also stated that he heard no shots fired that evening.

Detective James Scott with the Smyrna Police Department testified that part of his work involved forensic video analysis. Detective Scott had slowed the time lapse videotapes to "real time." These modified tapes were shown to the jury in the segments in which the defendant and Palmer appeared and those in which Troy Snell and Scott Myers appeared. On cross-examination, Detective Scott stated the video showed the defendant and Palmer in the BP from 10:43 p.m. to 10:48 p.m.

Salom Alhasmawy was recalled and identified Troy Snell as appearing on the BP videotape at 11:14 p.m. Another individual he did not identify entered at 11:06 p.m.

Gretchen Woodruff was a patrol officer for the Smyrna Police Department. She testified that she was dispatched to K-Mart at 2:22 a.m. on July 12. Upon her arrival behind K-mart, she observed a dark green, four-door vehicle. In the driver's seat was a white male with his head turned slightly toward the passenger side. She observed a small amount of blood on his neck and his tee shirt. The vehicle was not running, and she stated that the lights did not appear to be on.

Michael Selley was the owner of Mike's Pest control. He arrived at Captain D's at 3:00 a.m. on July 12 to perform the monthly pest service. Mr. Selley used his key to unlock the front door. He observed that the alarm system had not been set. During his inspection, a police officer knocked on the window. Mr. Selley went outside, and the officer inquired if there were any employees or other people in the building. Mr. Selley told the officer there were none and resumed his duties. He found a brown extension cord in the floor in front of the cook line. Mr. Selley opened the walk-in cooler and saw a body on the floor. He immediately called 9-1-1.

Brian Rowland, the night dispatcher for the Smyrna Police Department, testified that he received Wanda Jenkins' call at 2:20 a.m. and Michael Selley's call at 3:46 a.m., both on July 12.

Lieutenant Todd Spearman was supervisor of the Smyrna Police Detective Division. He testified that he responded to a dispatch to K-Mart in the early hours of July 12. At the scene behind K-Mart, he observed a person he later learned to be Troy Snell, dead in his car. After seeing a Captain D's shirt in the car, he sent an officer to the restaurant to check on other employees. Subsequently he was alerted to the crime scene at Captain D's. There he saw two bodies in the cooler, later identified as Brian Speight and Scott Myers. Mr. Myers' hands were bound by an extension cord that was also wrapped around his upper body. Lieutenant Spearman said that searches of the area between Captain D's and behind K-Mart produced no significant evidence. During the evening of July 12, Lieutenant Spearman and Tennessee Bureau of Investigation Agent Schlafly went to Tiffany Taylor's apartment at Imperial Garden Apartments to talk with the

defendant. The defendant told them she had been in the Shoney's/Captain D's area the night before with a friend she called "Michael." The two had gone to Shoney's for Michael to speak with a lady named Jamie in an effort to get money from her. The defendant said she went outside and waited for Michael in the Captain D's area. The defendant said she observed two white males working in Captain D's. When Michael rejoined her, they went to the BP station. The defendant's interview was interrupted by Percy Palmer knocking at the door. Palmer gave his name as Lee and left. The defendant then told the interviewing officers that the individual who called himself Lee was Michael. The defendant stated in her interview that she did not own a backpack.

During cross-examination, Lieutenant Spearman said there were no signs that the two victims at Captain D's had been moved to the cooler where they were found. No shell casings or expended bullets were found in the cooler.

Shannon Heckler, wife of Steven Heckler, testified that she and her husband lived next door to the defendant's sister, Tiffany. She said the defendant stayed with Tiffany occasionally. Mrs. Heckler also knew Percy Palmer. Early in the day of July 12, the defendant woke Mrs. Heckler and requested she turn on the television news. The defendant said she would be questioned about the crime because she was black and was in the wrong place at the wrong time. The defendant then asked to do a load of laundry because her niece had nothing to wear to school. The defendant placed the laundry in the washer and left with Percy Palmer after he arrived. Later in the day, Mrs. Heckler put the clothing in the dryer. She noted that almost all of the clothing belonged to the defendant.

Detective James Scott was sent to Imperial Garden Apartments on July 12 in search of an individual whom he later learned was Percy Palmer. He located Palmer, who presented a California identification for Billie Gene Palmer. He had distinctive tattoos on each arm, respectively reading "Cali" and "Killa."

Agent Dan Royse was a forensic scientist for the Tennessee Bureau of Investigation with an expertise in firearms identification. He also served on the Violent Crime Response Team. In this instance there were seven members on the team. In surveying the scene at K-Mart, he stated that Troy Snell's wallet was in his lap. The vehicle was in drive, and the victim's foot was on the brake pedal. The ignition key was in the "on" position. There was gas in the tank, but the car battery had expired.

At the Captain D's scene, Agent Royse first identified the two victims. He determined that the two vehicles parked there belonged to Brian Speight and Scott Myers. Agent Royse made a videotape of both crime scenes, which was played for the jury. By measurement, the closest foot path between Captain D's and the site where Troy Snell was found was 1100 feet. During the inspection of the Captain D's scene, two bags of money were found in the locked portion of the safe. The bags were marked as containing $700 and $787.81, respectively. He did not observe any obvious signs of a struggle within Captain D's.

Agent Royse examined three long rifle .22 caliber bullets that were removed from the victims during autopsy. The bullets all shared the same class characteristics and similar individual characteristics. However, due to their mutilation, it was impossible to conclude whether they were fired from the same weapon. The gunshot residue test performed on Troy Snell's hands proved negative.

On cross-examination, Agent Royse admitted that no physical evidence examined, including DNA, fingerprints, shoe prints, or other evidence, linked the defendant to the crimes. He stated that a .22 caliber long rifle bullet cannot be fired by a .380 caliber weapon. He also stated that the defendant and Palmer were arrested over a year after the offenses.

Linda Littlejohn was a forensic scientist at the Tennessee Bureau of Investigation Crime Laboratory. Ms. Littlejohn performed shoe print comparisons on prints submitted to her. She was never provided any shoes belonging to the defendant or Palmer, and no significant findings were made.

Hoyt Phillips' expertise as an employee of the Tennessee Bureau of Investigation Forensic Service Division was in processing latent fingerprint evidence. In this case he made more than one hundred comparisons. No latent fingerprints were found that matched those of the defendant or Percy Palmer.

Detective Rick Hall was an employee of the Smyrna Police Department. He testified that the television program, America's Most Wanted, was solicited to publicize this unsolved case. A segment was aired on May 19, 2001. A woman, Brooke Nason, and her boyfriend, Chris Hinds, came forward with information. The individuals were hired as paid informants. As a result, surveillance was begun by renting two adjacent rooms in motels and equipping one with audio and visual recording devices which were connected to the other room. This was done first in the Peachtree Inn in Nashville from July 5-8, 2001. Two other segments were recorded July 12-13, and July 17-19, 2001, at Ramada Inn in Nashville. Excerpts from the three sessions were played for the jury.

In one session, the defendant, after claiming her noninvolvement with the Captain D's incident, admits she had "something to do with it." The defendant stated that she disposed of her gun at a pawn shop. In the same conversation, she spoke of the event as something that "rides your conscience." The defendant stated she did not want to talk about it and said, "And it makes you feel bad because there you are feeling guilty about three dead people."

Later the defendant states, " . . . it ain't no big deal. Because I'll get a lesser sentence than the ones that really killed them." The defendant relates that she told Palmer about an individual who owed her money for drugs. She stated that she was with Palmer and that he had a gun but she did not. The two of them went first to Shoney's, then to Captain D's where she said she "showed her face" and they were admitted. The defendant said she went outside to wait on Palmer and heard gun shots. She went back inside and saw two bodies bleeding and Palmer was talking to Troy Snell. She

-6-

said that Palmer put the victims' bodies in the freezer and robbed them and the restaurant safe. The defendant said Troy ran out the back door with Palmer in pursuit. She went to the BP and heard a shot. Palmer rejoined her as she was walking to Imperial Garden Apartments. The defendant said that Palmer shared the robbery proceeds with her. The defendant expressed satisfaction that the police were getting false leads in their investigation.

In another session, the defendant said that Troy Snell "got his brains f–king blew out" in his car. She claimed to have already been over the railroad tracks at that time. After again discussing the money she received, the defendant acknowledged that she was an accessory to triple murder.

Later, on the one-year anniversary date of the incident, the defendant stated that she might be an accessory to some murders but did not kill anyone. She said she told Troy Snell to open the door, and he did. The defendant said that Palmer had blood all over him and that he threw his clothes in the dumpster at the Imperial Garden Apartments.

In a later recorded conversation, the defendant stated that she had gotten drugs for Troy Snell and that he had owed her money. The defendant said, "It's just like I got my money anyway and three dead people, so that shit isn't funny." She said she did not know that Palmer had a gun or what kind of gun it was. She stated she did not think he threw the gun in the dumpster with his clothing.

The defendant was arrested on July 19, 2001, and was placed in a squad car equipped with an audio recording device. Ms. Nason was taken into custody with the defendant. The audiotape of their conversation was played for the jury. Ms. Nason urged the defendant to "[j]ust tell them. . . ." The defendant responded, "No, Are you crazy. You don't realize how long I'm going to jail. I could actually go to the penitentiary. I can't go there." The defendant expressed her concerns about "somebody running their mouth" and wondered if Ms. Nason's boyfriend, Chris, was the source. The defendant said that if Chris was "running his mouth, he's going to be one dead mother f–ker."

Detective Rick Hall stated that a hunt for Percy Palmer was initiated and that he was eventually found and arrested in Aurora, Colorado on August 2, 2001. On cross-examination, Detective Hall stated that Ms. Nason was paid $600 and Mr. Hinds was paid $300 as informants. Additionally, they were paid $1500 in relocation expenses. Ms. Nason had expressed her expectation of receiving $70,000 reward money in the event of a conviction.

Dr. Bruce Levy, Chief Medical Examiner for the State of Tennessee and County Medical Examiner for Davidson County, testified as an expert in anatomical, clinical, and forensic pathology. He stated that his autopsy revealed the cause of Troy Snell's death to be a single gunshot wound to the head. The wound was between the victim's right ear and eye. The fouling and stippling present on the victim led Dr. Levy to conclude the weapon was fired approximately six inches from the victim's head. No defensive wounds were observed. He ruled the nature of death as homicide.

The autopsy of Brian Speight revealed that he died of a single gunshot to the back of the head. No stippling was present, which indicated that the weapon was fired at least two feet from the victim. He ruled the manner of death as homicide.

Dr. Levy testified that Scott Myers' hands were tied "fairly tightly" by electrical cord. The cause of death was a gunshot wound to the back of the head which severed the spinal cord and caused immediate death. No stippling was present, and he concluded the weapon was fired at least two feet from the victim. The victim had superficial abrasions to the head which Dr. Levy opined were a result of falling. The scrapes and tears found on the victim's hands indicated a struggle either with an attacker or with the binding ligature. The manner of Mr. Myers' death was also ruled as homicide.

Dr. Levy stated that one small caliber projectile was removed from each victim. He stated that in the case of Mr. Myers and Mr. Speight, the location, direction, and distance of the wounds were classified as "execution style shots," intended to kill the victim with one shot. Dr. Levy could not determine the sequence of the victims' deaths.

At the conclusion of Dr. Levy's testimony, the State rested and the defense began presenting evidence.

Agent Tom Brown, a Criminal Investigator with the Tennessee Bureau of Investigation, testified that he interviewed Gina Williams, the Shoney's employee who saw a black woman inside Captain D's on the night of the murders. He stated that she described the person as in her early to mid-twenties; approximately five feet, five inches; medium build; with her hair piled on top of her head. On cross-examination, Agent Brown said that Ms. Williams did not sign the notes he took during the interview.

The defense presented Darryl Lambert, an inmate in the penitentiary. He denied any involvement in these crimes and denied that he had told one Sally Padgett of his involvement.

Sally Padget was then called and testified that in 2000, she was addicted to cocaine. Darryl Lambert was a cocaine dealer who supplied her. Ms. Padgett testified as to what Lambert had allegedly told her concerning his involvement in the murders. Ms. Padgett admitted that she had been diagnosed as schizophrenic, had multiple personalities, and was currently on fifteen anti-psychotic medications. Ms. Padget also said, "I have no idea what I did yesterday."

The defense produced two witnesses who testified as to traffic they witnessed in the area of the K-Mart Center. Their testimony was conflicting as to times of their observation and the cars observed. Other witnesses described seeing a vehicle behind K-Mart at times ranging from 12:40 p.m. to 1:50 a.m. on July 12.

Jill Lynch testified that she saw the defendant at Imperial Garden Apartments between 10:30 p.m. and 11:00 p.m. on July 11.

Billy York, a resident of Imperial Garden Apartments, claimed to have seen the defendant and Palmer at the apartments in the time frame of 10:30 p.m. to 11:00 p.m. and again at 12:00 p.m. on July 11. Mr. York also stated he took a medication, Trazadone, that "makes me whackier than an old owl."

The defendant presented other witnesses who testified that they saw certain unidentified individuals in the area of the crime scene that evening. After voir dire of the defendant, she elected to forego her testimony, and the defense rested.

Sufficiency

The defendant challenges the sufficiency of the evidence to support the convictions. When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn.1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e). The same standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. See State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt so, on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In order to prove the defendant's guilt of the charged offenses, the State relied on the theory of criminal responsibility. Under Tennessee law, a person may be charged with an offense if "he or she is criminally responsible for the perpetration of the offense." T.C.A. § 39-11-401 (1997), Sentencing Commission Comments. A person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Id. § 39-11-402(2). Criminal responsibility is not a separate crime; rather, it is "solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999).

Under the theory of criminal responsibility, an individual's presence and companionship with the perpetrator of a felony before and after the commission of an offense are circumstances from which his or her participation in the crime may be inferred. See State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). No particular act need be shown, and the defendant need not have taken

a physical part in the crime in order to be held criminally responsible.  See id.  To be criminally responsible for the acts of another, the defendant must "in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree."  State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting Hembree v. State, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)).

The defendant was convicted of three counts of premeditated first degree murder, three counts of felony first degree murder, one count of especially aggravated robbery, and two counts of especially aggravated kidnapping.  To obtain a conviction for first degree premeditated murder, the State had to show "[a] premeditated and intentional killing of another."  T.C.A. § 39-13-202(a)(1) (1997).  For the purposes of this crime, "premeditation" is an act done after the exercise of reflection and judgment.  "'Premeditation' means that the intent to kill must have been formed prior to the act itself.  It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time."  T.C.A. § 39-13-202(d) (1997).  "'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result."  T.C.A. § 39-11-302(a) (1997).

The defendant was indicted of felony murder during the perpetration of or attempt to perpetrate any robbery, burglary, theft, or kidnapping, in violation of Tennessee Code Annotated section 39-13-202.  Premeditated murder and felony murder are not separate and distinct offenses but, rather, are alternative means to attach criminal liability for first degree murder.  State v. Ely, 48 S.W.3d 710, 721 (Tenn. 2000).  The mental state required for the commission of felony murder is intent to commit the alleged felony.  T.C.A. § 39-13-202(b) (1998).

Especially aggravated robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear and is accomplished with a deadly weapon wherein the victim suffers serious bodily injury.  T.C.A. § 39-13-401 (1990) and -403 (1989).

Especially aggravated kidnapping is committed when one knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty and is accomplished with a deadly weapon or where the victim suffers serious bodily injury.  T.C.A. § 39-13-305 (1990).

The defendant, in challenging the sufficiency of the evidence supporting the convictions, does not contend that the crimes were not committed but relies instead on the premise that the alibi evidence for the defendant provides significant proof that the defendant was at the Imperial Garden Apartments before the victims were slain.

The proof in this case was largely circumstantial but, in our view, extremely strong evidence that, in its totality, pointed unerringly to the defendant's guilt.  The defendant's cousin, Melanie Taylor, testified that the defendant attempted to enlist her in a robbery scheme during the week preceding these offenses.  The defendant was unquestionably in the vicinity of Captain D's on the evening of the offenses.  The videotape at the BP station placed her and Percy Palmer there at 10:43

p.m. Jamie Johns testified that the defendant and Palmer were at Shoney's just before 11:00 p.m. Gina Williams closed Shoney's at 12:01 a.m. and described seeing a black female with a backpack in Captain D's who generally matched the defendant's description. Although the defendant's recorded account of events to the confidential informants contained some factual discrepancies, her admissions of involvement were convincing. These recorded statements provided stark evidence of her complicity in planning the robbery and that she shared in the proceeds.

The defendant contends that the testimony of Jill Lynch and Billy York established that the defendant had returned to the Imperial Garden Apartments prior to the murders and robbery. Ms. Lynch testified that she saw the defendant for an instant between 10:30 p.m. and 11:00 p.m. at the apartments. Unless her sighting was during the early part of the time frame, this would conflict with the BP video and the testimony of Jamie Johns. Billy York also stated that the defendant and Palmer were at the apartments by midnight but admitted that his medications impaired his memory. In any event, we must presume that the jury resolved all conflicts in the testimony and drew all reasonable inferences in favor of the State. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984).

Under the theory of criminal responsibility, the evidence was sufficient to support the defendant's convictions for premeditated murder. The element of premeditation is a question of fact to be determined by the jury. State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Our supreme court has set forth non-exclusive factors which tend to support the existence of premeditation, including the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. Bland, 958 S.W.2d at 660. The defendant had announced her intention to be armed during her planned robbery. All three victims were unarmed and were shot "execution style" according to the forensic pathologist. Two victims were concealed from outside eyes in the walk-in cooler where one was bound and the other was kneeling in a submissive position. The other victim was left behind a shopping mall. Although witnesses differed, there was testimony of the defendant's calmness after the killings.

The evidence supporting felony murder, especially aggravated robbery, and especially aggravated kidnapping is even stronger. The defendant assisted in the planning of a robbery, was present at the scene, and shared in the proceeds taken. The crimes were accomplished with a deadly weapon and deadly results. Removal of the two victims to the walk-in cooler was not a necessary step in the robbery and qualified as especially aggravated kidnapping by the use of a deadly weapon.

In summary, the jury was entitled to disregard the alleged alibi evidence, and we conclude that sufficient evidence existed that justified a rational jury in returning the guilty verdicts.

Testimony of Melanie Taylor

The defendant next contends that the trial judge erred in allowing Melanie Taylor's testimony that the defendant attempted to recruit her to participate in an "inside job" robbery. This

conversation took place within a week prior to the offenses. The defendant argues that due to the vagueness of the robbery plans as to a particular location or time, the evidence was irrelevant or otherwise excludable as unduly prejudicial under Tennessee Rule of Evidence 403.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Once the court concludes the evidence is relevant, the court should exclude the evidence if its probative value is substantially outweighed by its prejudicial effect. Tenn. R. Evid. 403; State v. James, 81 S.W.3d 751, 757 (Tenn. 2002). A trial court's decision as to the relevance of evidence under Rule 401 will be reversed only upon a showing of abuse of discretion. State v. Powers, 101 S.W.3d 383, 395 (Tenn. 2003). An appellate court should find an abuse of discretion when it appears that a trial court applied an incorrect legal standard or reached a decision which is against logic or reasoning that caused an injustice to the complaining party. Ballard v. Herzke, 924 S.W.2d 652, 661 (Tenn. 1996).

In the instant conversation, the defendant invited Ms. Taylor to join her and Percy Palmer in a robbery that the defendant characterized as an "inside job." The locale was not specified except by an allusion to it being "up the street." The defendant did state that she had a gun. The defendant also asked to use Ms. Taylor's car. While the plan was admittedly lacking in specifics, it was broached within a week of the subject offenses. Due to the proximity in time, we conclude that it was not an abuse of discretion to allow the testimony. Having affirmed the relevance of the testimony at issue, we also conclude that it was not excludable by the balancing test of Tennessee Rule of Evidence 403. The evidence of the defendant planning a robbery was undoubtedly prejudicial but, in our view, was not unfairly prejudicial.

Surveillance Tapes

In her next issue, the defendant contends that the trial court erred in failing to suppress all the video/audio tapes which were recorded on three occasions. The defendant argues that the defendant's statements were involuntary, prejudicial, inaccurate, misleading, confusing to the jury, contextual, taken out of context, manipulated, non-responsive, inflammatory, and irrelevant. In addition, the defendant maintains that the use of the excerpts violated Tennessee Rules of Evidence 401, 402, 403, 404, 405, 609, and 802, as well as the defendant's rights under the 4th, 5th, 6th, and 14th Amendments to the U. S. Constitution and Article I, Sections 7, 8, 9, and 16 of the Tennessee Constitution. The defendant does not address in argument the alleged evidentiary rules but essentially contends that the confessions were involuntary as the product of manipulation by the confidential informants who encouraged the defendant to become impaired.

The findings of fact made by the trial court on a motion to suppress are binding upon this court unless the evidence preponderates against them. State v. Carter, 988 S.W.2d 145, 149 (Tenn. 1999). This court is not bound by the trial court's conclusions of law. State v. Simpson, 968 S.W.2d 776, 779 (Tenn. 1998).

Confessions that are involuntary, i.e., the product of coercion, whether it be physical or psychological, are not admissible. Rogers v. Richmond, 365 U.S. 534, 540, 81 S. Ct. 735 (1961). The test of voluntariness under the Tennessee Constitution is broader and more protective than the test of voluntariness under the United States Constitution. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). Coercive police activity is a necessary prerequisite to find a confession involuntary. State v. Brimmer, 876 S.W.2d 75, 79 (Tenn. 1994). The crucial inquiry is whether the State agents' behavior was "such as to overbear petitioner's will to resist and bring about confessions not freely self-determined." State v. Kelly, 603 S.W.2d 726, 728 (Tenn. 1980) (quoting Rogers, 365 U.S. at 544, 81 S. Ct. at 741). The question must be answered with "complete disregard" of whether or not the accused was truthful in the statement. Rogers, 375 U.S. at 544, 81 S. Ct. at 741.

The evidence at the suppression hearing established that the defendant was drinking alcohol and on one occasion, smoking marijuana during the surveillance segments. After the suppression hearing, the trial court issued a lengthy order which excluded some statements and allowed others. None of the defendant's statements were barred on the basis of involuntariness. The following extract is from the trial court's Order on the Motion to Suppress:

> Having reviewed the motions and having heard the testimony, the Court cannot conclude that the statements were the result of any improper or overbearing police tactic as prohibited by prevailing law. Further, the Court finds no evidence, though implied by defendant, that alcohol or other substance was provided by the State (or its agents) to the defendant in an attempt to elicit incriminating statements.
>
> Therefore, the Court finds no basis for legal suppression of any of the statements on the basis of involuntariness. The use of alcohol or drugs will go to the weight of the evidence rather than admissibility. As to each challenge below in which involuntariness due to intoxication is raised, the Court finds no basis for such an argument.

Our review of the record compels us to conclude that the defendant's statements, which were admitted, were directly relevant to her role in the offenses and not violative of other evidentiary rules. Furthermore, we agree that the record lacks evidence that the State agents provided the defendant with intoxicants. The defendant has not shown that her statements were the product of her will being overborne by coercive State actions. Accordingly, we conclude that the statements were properly admitted.

Mental Retardation

The defendant's last issue alleges error in the trial judge's failure to find the defendant mentally retarded pursuant to Tennessee Code Annotated section 39-13-203. As a companion issue, the defendant argues that the standard enunciated in State v. Smith, 893 S.W.2d 908 (Tenn. 1994), conflicts with prevailing mental retardation standards as utilized by the mental health community.

The issue arose when the defendant filed a Motion to Strike the State's Notice of Intent to Seek the Death Penalty. A lengthy hearing was held, and the trial court issued a very detailed and thorough order which found that the defendant had not proved her mental retardation by a preponderance of the evidence. The trial court further found that the Smith standard was the appropriate standard by which to measure the defendant's mental retardation claim.

Ultimately the defendant, although eligible for the death penalty, received three concurrent life sentences. This issue retains viability only in the event of a new trial. Our review has found no reversible error. We conclude that the issue is moot and will not consider it on the merits.

## Conclusion

From our review of the record in this cause, we conclude that the evidence was sufficient to support the judgments of conviction. Furthermore, the testimony of Melanie Taylor and the video/audio tapes produced through the confidential informants were properly admitted. Due to mootness, we have declined to review the mental retardation issues. Accordingly, the judgments of conviction are affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE